# IN THE COURT OF APPEALS OF IOWA

No. 21-1473
Filed January 27, 2022

**IN THE INTEREST OF L.P., G.J., N.J., N.J., G.J., R.J., L.J., M.J. & R.J.,**
**Minor Children,**

**J.P., Mother,**
      Appellant.

_____

Appeal from the Iowa District Court for Dubuque County, Thomas J. Straka,

Associate Juvenile Judge.

A mother appeals the termination of her parental rights to nine children.

**AFFIRMED.**

Gina L. Kramer of Kramer Law Office, PLLC, Dubuque, for appellant

mother.

Thomas J. Miller, Attorney General, and Michelle R. Becker, Assistant

Attorney General, for appellee State.

Kristy L. Hefel of the State Public Defender's Office, Dubuque, attorney and

guardian ad litem for minor children.

Considered by Bower, C.J., and Greer and Badding, JJ.

**BADDING, Judge.**

Faced with numerous reports of child neglect, lack of supervision, and substance abuse by the mother and father, the juvenile court terminated their parental rights to nine children under Iowa Code section 232.116(1)(f), (h), and (*l*) (2021). Only the mother appeals.[1] She contests each of the three steps in the termination process, *see In re P.L.*, 778 N.W.2d 33, 40 (Iowa 2010), and requests more time to work toward reunification. After independently reviewing the record, we reach the same conclusions as the juvenile court and affirm.

## I. *Background Facts and Proceedings*

In July 2020, the Iowa Department of Human Services began to piece together a troubling pattern of inadequate supervision by the parents after receiving four consecutive police reports regarding their middle children, ranging from ages four and ten. The first incident occurred in early May. Four of the children were found wandering unsupervised two miles from home in chilly weather without their parents' knowledge. Only one of the children was wearing a coat, and another one was not wearing shoes. When the children were returned home, the parents admitted not knowing they had left. Upon referral, the department got involved. The investigation led to a founded child abuse report against the parents for denial of critical care and failure to provide proper supervision.

---

[1] Eight of the children have the same biological father, whose rights were terminated. He filed a notice of appeal, but the supreme court dismissed his appeal as untimely. The biological father of the oldest child, L.P., was not part of the juvenile proceedings. Thus, neither father's rights are at issue here. This appeal concerns only the termination of the mother's parental rights to all nine children.

That same month, police responded to a report that two of the children, R.J. and G.J., then ages six and four, were "walking around in their PJs" without adult supervision for the second time in a week.  An officer transported the children back home and woke the parents, who were asleep in their bedroom.  When the officer informed them about their children's whereabouts, the father responded, "[T]his isn't the first time."  Nor would it be the last time.

A third incident involving these same two children happened in mid-July.  R.J. and G.J. were caught stealing candy at a gas station several blocks from home.  When an officer approached the children, he noticed they were "barefoot, very dirty, and smelled as if they had not bathed in days."  As before, the parents had no idea where the children were.  Another child abuse assessment followed and was founded against the parents for denial of critical care.  Both parents were charged with neglect or abandonment of a dependent person, a class "C" felony under Iowa Code section 726.3 (2020).

Around the same time, the State filed child-in-need-of-assistance (CINA) petitions for each of the nine children. While awaiting the adjudicatory hearing, the department obtained court approval to conduct a safety check at the family's home.  Upon entering the home, the child protective worker documented significant safety and sanitary concerns, including bedrooms with animal feces and urine, inoperable bathtubs, a sink that didn't drain properly, and a broken refrigerator.  There was minimal food in the home for the family, although the infant twins did have formula and baby food.  While there were several couches in the home, there were no beds for anyone to sleep on.  The department followed up

with a safety plan that required the parents to comply with drug testing and family preservation services.

Meanwhile, less than two weeks after the last incident, four-year-old G.J. escaped once more. His whereabouts were unknown for an hour before he was spotted by security personnel on a nearby college campus. Although the parents had screwed the front door shut to prevent the children from leaving the house, it appeared G.J. had climbed through one of the door's glass panels that could be pushed open. Yet, according to police, the mother "blamed the older kids for [G.J.] getting out."

Thereafter, new allegations emerged that the parents were using methamphetamine in the children's presence. A service provider noticed a "puncture mark scabbed over" on the mother's arm and symptoms of drug withdrawal. But the department could not confirm the allegations "due to [the parents] not complying with drug testing." This raised immediate concerns for the department, given the parents' history of substance abuse. This history dated back to 2016 when G.J., who was only six months old at the time, tested positive for methamphetamine and amphetamines by ingestion and exposure.

Beyond drug testing, the parents ignored "[a]ll other aspects of the safety plan" and refused voluntary services. Citing their lack of cooperation, the department sought a temporary removal order, which the juvenile court entered in early August. The children were removed from the parents' custody and placed in various family foster care homes, except for the oldest child who went to live with her biological father. The court ordered drug screens of the children at the time of removal, and three of them, including one of the youngest twins born in December

2019, tested positive for methamphetamine. As a result, the department filed an addendum to the founded July report based on the presence of illegal drugs in the three children, naming both parents as the perpetrators.

By September, the children were adjudicated in need of assistance under Iowa Code section 232.2(6)(c)(2), (e), (n), and (o). The juvenile court found the State's evidence "clearly establish[ed] the repeated inadequate supervision provided by the parents; the unsanitary conditions of the home; the parents' refusal to allow access to the children; and the parents' refusal to cooperate with assessments and services in order to ensure the safety of the children." The court also noted that some of the children had not received necessary medical and dental care, and all of them "appeared very hungry and ate significant amounts of food while at the department offices." The children were confirmed CINA after a dispositional hearing in late October, when the court set the permanency goal to reunification.

Concerns about the parents' substance abuse and lack of supervision persisted as the case progressed. As highlighted in a January 2021 report to the court, they remained unwilling to cooperate with the department or participate in services. They continued to refuse drug testing and failed to complete mental-health and substance-abuse evaluations, in violation of court orders. They made excuses for their noncompliance, taking no "accountability for their own actions or inactions in regard to their children." By the time of the dispositional review hearing in February, they had been evicted from their home and were living in a van. Given their "complete lack of progress," the court scheduled a second

dispositional review hearing for May while encouraging the parents to request additional services if needed.

That hearing came and went without much improvement. Based on the case progress reports since the last hearing, the juvenile court determined that "[t]he biggest area of progress for the parents was obtaining appropriate housing." They had regressed on all other fronts. Both the father and mother had two positive sweat-patch tests—one in February and one in March 2021. Yet they repeatedly denied using and blamed others for their children's exposure to drugs. They missed many drug tests. While the mother did complete a substance-abuse evaluation, the treatment provider reported: "The counselor was unable to make an accurate assessment, as the client denied all current and past substance or alcohol use, despite her also self-reporting positive drug screens, which she insisted were inaccurate." Much like their attitude toward drug testing, the parents resisted the department's efforts to help them.

Two months later, the State petitioned to terminate parental rights. An August hearing on the petition was continued because the mother had just given birth to her tenth child. History repeated itself when the newborn tested positive for amphetamines and methamphetamine at the hospital and was "showing some twitching or jittery movements consistent with withdrawal from stimulants." The mother also tested positive for amphetamines as well as opiates, but she again denied drug use. Given these circumstances, another child abuse assessment was founded against the mother for the presence of illegal drugs in the child.

The juvenile court held the rescheduled termination hearing in late September. Due to the pending criminal charges, neither parent testified. Three

witnesses testified for the State, including two family support specialists who supervised visits and the department case manager. Both specialists described the visits as "chaotic." They attributed the chaos in part to the children "constantly running around, screaming, fighting, [and] playing," and the parents failing to monitor them. Two to three service providers had to attend each visit to make up for the parents' continual lack of supervision. Even so, the parents complained "no one's doing anything to help them." According to the case manager, the parents never stopped blaming the department, service providers, and police for the removal of their children.

Based on the evidence presented, the court granted the State's petition to terminate the parents' rights under Iowa Code section 232.116(1)(f), (h), and (*l*) and rejected the parents' requests for an extension. The mother appeals.

## II. Analysis

In conducting our de novo review of the termination of the mother's parental rights, we consider three steps: (1) whether the State's evidence supports a ground for termination under section 232.116(1); (2) whether termination is in the children's best interests based on the factors in section 232.116(2); and (3) whether any exceptions to termination apply under section 232.116(3). *In re M.W.*, 876 N.W.2d 212, 219–20 (Iowa 2016). The mother contests each step, starting with the grounds for termination.

### A. Statutory Grounds

The juvenile court terminated the mother's parental rights under paragraph (h) for the two youngest children, paragraph (f) for the remaining seven children, and paragraph (*l*) for all nine children. "On appeal, we may affirm the juvenile

court's termination order on any ground that we find supported by clear and convincing evidence." *In re D.W.*, 791 N.W.2d 703, 707 (Iowa 2010). Because the mother challenges a common element under both paragraphs (f) and (h)—that the children cannot be safely returned to her custody at the present time—we choose to focus on these two grounds. *See* Iowa Code § 232.116(1)(f)(4), (h)(4); *see also In re A.S.*, 906 N.W.2d 467, 473 (Iowa 2018).

The mother argues the State failed to sufficiently prove that element because the evidence did not establish that safety risks existed in her new home and that "[she] was the cause of any of the children . . . testing positive for controlled substances." She also contends the juvenile court relied too heavily on her "prior bad acts." Specifically, she claims the court erred in concluding she posed a present danger to the children based on concerns raised about her methamphetamine use in 2016. Both arguments miss their mark.

Starting with the last argument, the mother's methamphetamine use was not in her rearview mirror as she would have us believe. Since the department has been involved with this family, five of the children have tested positive for methamphetamine, now including the youngest, who tested positive at birth just a month before the termination hearing. Yet the mother continues to deny any drug use despite several test results showing otherwise. Although the mother deflects responsibility for her children's proven drug exposure, we find it significant that she thwarted the department's and the court's ability to confirm her sobriety by repeatedly avoiding drug testing. *See In re I.J.*, No. 20-0036, 2020 WL 1550702, at *2 (Iowa Ct. App. Apr. 1, 2020) ("We presume these missed drug tests would have resulted in positive tests."). Her denial and lack of insight into her addiction

in itself present a danger to the children. *See In re J.P.*, No. 19-1633, 2020 WL 110425, at *2 (Iowa Ct. App. Jan. 9, 2020) (affirming statutory ground based solely on parent's consistent methamphetamine use and lack of engagement in treatment).

Just as the mother fails to recognize the harm caused by her substance abuse, she demonstrates a lack of self-awareness in her role as a parent. For instance, she highlights that she "provide[d] food, drinks, clothing, diapers, wipes, and toys at visits" and obtained safe housing for the children. But the concerns preventing reunification were deeper than that. The mother was unable to keep her children safe without intervention from either the department, police, or service providers. She needed help supervising and monitoring the children at every turn.

After a year of services, the mother's visits with the children only became more chaotic. The family support specialists testified they never reached their goal of reducing the number of providers at each visit because "[t]he parents weren't supervising their visits at all," instead viewing the providers as "just being babysitters for them." The mother had to be reminded to feed the children appropriate food, change their diapers, and attend their medical appointments.[2] She relied on providers to care for her children rather than gaining the skills necessary to care for them on her own. *See In re A.M.*, 843 N.W.2d 100, 111–12 (Iowa 2014) (finding termination appropriate where parents could not internalize necessary skills to keep their child safe and developing properly

---

[2] One of the children was diagnosed with muscular dystrophy and another has cerebral palsy.

"without the hovering supervision of [department] workers"). All the providers agreed the mother could not safely supervise the children on her own.

With this record, we agree that the children could not be safely returned to the mother's care at the time of the termination hearing. The grounds for termination were therefore established under section 232.116(1)(f) and (h).

## B. Best Interests and Exceptions

Combining the remaining two steps in the analysis, the mother argues termination is not in the children's best interests because of the bond she shares with each of them and them with each other. She suggests both the parental and sibling bond would be disrupted to the children's detriment because they have been split up into four separate foster homes. We believe this argument is more properly considered in two parts as the closeness of the parent-child relationship is a permissive exception to termination under section 232.116(3)(c) and not a factor in the best-interests framework. *See In re J.C.*, No. 19-1985, 2020 WL 1049840, at *2 n.3 (Iowa Ct. App. Mar. 4, 2020) (reiterating natural sequence of three-step analysis).

In determining whether termination is in the children's best interests, we must "give primary consideration to the child[ren]'s safety, to the best placement for furthering the long-term nurturing and growth of the child[ren], and to the physical, mental, and emotional condition and needs of the child[ren]." Iowa Code § 232.116(2). We have emphasized that the children's safety and need for permanency are the touchstones of our best-interests analysis. *See In re J.E.*, 723 N.W.2d 793, 802 (Iowa 2006) (Cady, J., concurring specially). For the reasons already discussed, we reject the mother's implicit assertion that returning the

children to her care would be in their best interests. The record establishes the mother has not taken the steps necessary to show the children would be safe with her either in the short-term or the long-term without ongoing involvement.

And while it is lamentable that the nine siblings cannot all be placed together, it is unclear what the mother would have us do. *See In re W.A.*, No. 16-1774, 2017 WL 104975, at *3 (Iowa Ct. App. Jan. 11, 2017). Whether the children are in one or multiple placements, "they cannot return to the mother's care at this time, and they need permanency." *Id.* "We cannot place the importance of the sibling bond over the individual safety and well-being of each of the children." *Id.*

We likewise find the closeness of the parent-child relationship is not enough to override the children's need for a safe and permanent home. The record shows the children have all been adjusting well in their placements and their needs are being met by their foster parents. As the guardian ad litem reported to the court: "The children hav[e] exhibited noticeable growth physically and emotionally during the time that they have been in family foster care presumably enjoying a stable, secure and loving environment." We decline to interrupt their growth when the mother has been unwilling to do her part.

### C. Additional Time for Reunification

We turn then to the mother's final argument that the juvenile court should have given her more time to achieve reunification. She insists that she has "substantially complied with the department's expectations for substance abuse and mental health counseling" and again notes that she "effectively eliminated any concern about instability of housing for the family." Even if her contentions were

true, which they are not, the record reveals significant concerns about her lack of basic parenting skills, failure to take accountability, and general disregard for her children's safety, none of which she addresses. The few steps she took to appease the department did not negate or eradicate those concerns. While she claims an extension would allow her to meet the department's expectations, there is no evidence in the record to support her claim. Rather than repeat our findings, we find it apt to end our discussion with a passage written by this court in *In re H.L.B.R.*, 567 N.W.2d 675, 677 (Iowa Ct. App. 1997):

> The goal of a [CINA] proceeding is to improve parenting skills and maintain the parent-child relationship. When the State seeks termination, it is because the State has been unable to furnish the help necessary to correct the parent's deficiencies. An underlying issue in a termination action is whether the parent is beyond help. A parent does not have an unlimited amount of time in which to correct his or her deficiencies.

Having reviewed the record, we agree with the juvenile court that an extension of time is not warranted under these circumstances. For all these reasons, we affirm the termination of the mother's parental rights.

**AFFIRMED.**